# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **EDWARD H. GONZALEZ,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO.** |
| | § | |
| **JO ANNE B. BARNHART,** | § | **SA-06-CA-0037 FB (NN)** |
| **Commissioner of the Social** | § | |
| **Security Administration,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:   Hon. Fred Biery
      United States District Judge

## I. Introduction

Plaintiff Edward H. Gonzalez seeks review and reversal of the administrative denial of his application for Supplemental Security Income (SSI) by the Administrative Law Judge (ALJ). Gonzalez contends that the ALJ erred by rejecting the opinion of his treating physician, disregarding a former supervisor's statement, relying on the vocational expert's testimony, and disregarding his non-exertional impairments.  Gonzalez maintains the ALJ failed to apply and follow proper legal standards, requiring the District Court to reverse the decision of the defendant, the Commissioner of the Social Security Administration (SSA), denying him benefits. Gonzalez asks the District Court to reverse the decision and to render judgment in his favor.  In the alternative, Gonzalez asks the District Court to reverse the decision and remand the case for further factual development.

After considering Gonzalez's brief in support of his complaint,[1] the brief in support of the Commissioner's decision,[2] Gonzalez's reply brief,[3] the record of the SSA proceedings, the pleadings on file, the applicable case authority and relevant statutory and regulatory provisions, and the entire record in this matter, I recommend affirming the Commissioner's decision.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and this district's general order, dated July 17, 1981, referring for disposition by recommendation all cases where a plaintiff seeks review of the Commissioner's denial of the plaintiff's applications for benefits.[4]

## II. **Jurisdiction**

The District Court has jurisdiction to review the Commissioner's final decision as provided by 42 U.S.C. §§ 405(g), 1383(c)(3).

## III. **Administrative Proceedings**

Based on the record in this case, Gonzalez fully exhausted his administrative remedies prior to filing this action in federal court.  Gonzalez filed for SSI benefits on July 27, 2003, alleging disability beginning May 27, 2003.[5]  The Commissioner denied the application initially

---

[1]Docket entry # 12.

[2]Docket entry # 15.

[3]Docket entry # 16.

[4]*See* Local Rules for the Western District of Texas, appx. C, p. 10.

[5]SSA record, p. 52.

and on reconsideration.[6]  Gonzalez then asked for a hearing before an ALJ.[7]  A hearing was held

before an ALJ on April 20, 2005.[8]  The ALJ issued a decision on July 29, 2005, concluding that

Gonzalez is not disabled within the meaning of the Social Security Act (the Act).[9]  Gonzalez

asked for review of the decision on September 23, 2005.[10]  The SSA Appeals Council concluded

on December 1, 2005, that no basis existed for reviewing the ALJ's decision.[11]  The ALJ's

decision became the final decision of the Commissioner for the purpose of the District Court's

review pursuant to 42 U.S.C. § 405(g).  Gonzalez filed this action seeking review of the

Commissioner's decision on January 19, 2006.[12]

**IV.  Issue Presented**

>    Is the ALJ's decision that Gonzalez was not under a "disability," as
>    defined by the Act, at any time through the date of the decision,
>    supported by substantial evidence and does the decision comport
>    with relevant legal standards?

**V.  Analysis**

**A. Standard of Review**

In reviewing the Commissioner's decision denying disability benefits, the reviewing court

is limited to determining whether substantial evidence supports the decision and whether the

---

[6]*Id*. at pp. 29, 31 & 37.

[7]*Id*. at p. 41.

[8]*Id*. at pp. 266-309.

[9]*Id*. at p. 9.

[10]*Id*. at p. 8.

[11]*Id*. at p. 4.

[12]*See* Gonzalez's complaint, docket entry # 3.

Commissioner applied the proper legal standards in evaluating the evidence.[13]  "Substantial

evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."[14]  Substantial evidence

"must do more than create a suspicion of the existence of the fact to be established, but 'no

substantial evidence' will be found only where there is a 'conspicuous absence of credible

choices' or 'no contrary medical evidence.'"[15]

     If the Commissioner's findings are supported by substantial evidence, then they are

conclusive and must be affirmed.[16]  In reviewing the Commissioner's findings, a court must

carefully examine the entire record, but refrain from reweighing the evidence or substituting its

judgment for that of the Commissioner.[17]  Conflicts in the evidence and credibility assessments

are for the Commissioner and not for the courts to resolve.[18]  Four elements of proof are weighed

by the courts in determining if substantial evidence supports the Commissioner's determination:

(1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians,

(3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age,

---

[13]*Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995); 42 U.S.C. §§ 405(g), 1383(c)(3).

[14]*Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[15]*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988) (quoting *Hames*, 707 F.2d at 164).

[16]*Martinez*, 64 F.3d at 173.

[17]*Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.).

[18]*Martinez*, 64 F.3d at 174.

education and work experience.[19]

### 1. Entitlement to Benefits

Every individual who meets certain income and resource requirements, has filed an application for benefits, and is under a disability, is eligible to receive SSI benefits.[20]  The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[21]  A claimant shall be determined to be disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[22]

### 2. Evaluation Process and Burden of Proof

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process.[23]  A finding that a claimant is disabled or not disabled

---

[19]*Id.*

[20]42 U.S.C. § 1382(a)(1) & (2).

[21]42 U.S.C. § 1382c(a)(3)(A).

[22]42 U.S.C. § 1382c(a)(3)(B).

[23]20 C.F.R. §§ 404.1520 and 416.920.

at any point in the process is conclusive and terminates the Commissioner's analysis.[24]

The first step involves determining whether the claimant is currently engaged in substantial gainful activity.[25]  If so, the claimant will be found not disabled regardless of his medical condition or his age, education, or work experience.[26]  The second step involves determining whether the claimant's impairment is severe.[27]  If it is not severe, the claimant is deemed not disabled.[28]  In the third step, the Commissioner compares the severe impairment with those on a list of specific impairments.[29]  If it meets or equals a listed impairment, the claimant is deemed disabled without considering his age, education, or work experience.[30]  If the impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity and the demands of his past work.[31]  If the claimant is still able to do his past work, the claimant is not disabled.[32]  If the claimant cannot perform his past work, the Commissioner moves to the fifth and final step of evaluating the claimant's ability, given his residual capacities,

---

[24]*Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

[25]20 C.F.R. §§ 404.1520 and 416.920.

[26]*Id.*

[27]*Id.*

[28]*Id.*

[29]*Id.*

[30]*Id.*

[31]*Id.*

[32]*Id.*

age, education, and work experience, to do other work.[33]  If the claimant cannot do other work,

he will be found disabled.  The claimant bears the burden of proof at the first four steps of the

sequential analysis.[34]  Once the claimant has shown that he is unable to perform his or her

previous work, the burden shifts to the Commissioner to show that there is other substantial

gainful employment available that the claimant is not only physically able to perform, but also,

taking into account his exertional and nonexertional limitations, able to maintain for a significant

period of time.[35]  If the Commissioner adequately points to potential alternative employment, the

burden shifts back to the claimant to prove that he is unable to perform the alternative work.[36]

**B. Findings and Conclusions of the ALJ**

In the instant case, the ALJ reached his decision at step five of the evaluation process.  At

step one, the ALJ determined that Gonzalez had not engaged in substantial gainful activity since

his alleged onset date.[37]  At step two, the ALJ determined that Gonzalez has medically

determinable impairments due to status post prostatectomy, status post hernia repair, chronic

obstructive pulmonary disease (COPD), a history of back pain, and a history of

anxiety/depression.[38]  The ALJ characterized these impairments as severe.[39]  At step three, the

---

[33]*Id.*

[34]*Leggett*, 67 F.3d at 564.

[35]*Watson  v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002).

[36]*Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).

[37]SSA record, p. 13.

[38]*Id.*

[39]*Id.*

ALJ found that Gonzalez's impairments, either singly or in combination, are not severe enough to meet, medically equal or functionally equal one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Appendix 1).[40]  At step four, the ALJ found that Gonzalez is unable to perform any of his past relevant work,[41] but that he retained the residual functional capacity for light work or to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours of an 8-hour day with normal breaks, and sit 6 hours of an 8-hour day with normal breaks.[42]  He also determined that Gonzalez is limited to semiskilled tasks.[43]  At step five, the ALJ determined that Gonzalez has the transferrable skills of equipment operator skills and that Gonzalez is capable of performing a significant range of light work.[44]  Thus, the ALJ concluded that Gonzalez is not disabled as defined in the Act.[45]

**C.  Gonzalez's Allegations of Error**

Gonzalez claims that the ALJ erred in determining that he is not under a disability as defined by the Act.  Specifically, he complains that the ALJ rejected the opinion of Dr. Antonio Lopez, disregarded his former's supervisor's opinion about why he quit his job, disregarded his non-exertional impairments, and relied on the vocational expert's testimony.  My discussion of these complaints is included in my analysis of the applicable step of the SSA's five-step process.

---

[40]*Id.*

[41]*Id.* at p. 18.

[42]*Id.* at p. 16.

[43]*Id.*

[44]*Id.* at p. 17.

[45]*Id.* at p. 18.

**1. Whether substantial evidence supports the ALJ's step-four determination**

In determining that Gonzalez has the residual functional capacity for light exertional work and that he is limited to semi-skilled tasks, the ALJ observed that although Gonzalez based his disability claim on prostate cancer, Gonzalez worked for three years after his prostatectomy, until he had his hernia repair.[46]  About impairment resulting from Gonzalez's hernia repair, the ALJ observed that the hernia surgery was successful and Gonzalez recovered a few months after the surgery.[47]  About impairment due to chronic obstructive pulmonary disease, the ALJ observed that Gonzalez still smoked and that his oxygen levels had been found to be within normal limits.[48]  The ALJ observed that Gonzalez hurt his back in March 2000, but was assessed an impairment rating of 0% on June 30, 2000.[49]  About Gonzalez's complaints of anxiety and depression, the ALJ considered that Gonzalez is not under care of a psychiatrist, psychologist or counselor and that he uses medication therapy.[50]  The ALJ noted the document in Gonzalez's file wherein Dr. Lopez indicated that Gonzalez would never be able to return to work[51] and explained that the statement was not entitled to controlling weight because it was not supported by clinical findings and because the statement was inconsistent with other substantial evidence.[52]  The ALJ

---

[46]*Id*. at p. 14.

[47]*Id*.

[48]*Id*.

[49]*Id*. at p. 15.

[50]*Id*.

[51]*Id*. at p. 120.

[52]*Id*.

explained that his opinions were based in large part on well supported and credible testimony and opinions by Dr. William Hicks, the medical expert who testified at Gonzalez's hearing.[53]  The ALJ concluded that Gonzalez retained the residual functional capacity for light work or to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours of an 8-hour day with normal breaks; and sit 6 hours of an 8-hour day with normal breaks.[54]  This determination is supported by supported evidence.  That evidence is summarized and analyzed below by impairment.

     Status post prostatectomy.  Medical records from Baptist Health System indicate that Gonzalez was admitted on March 24, 2000, with a diagnosis of adenocarcinoma of the prostate.[55]  Adenocarcinoma is "a cancer growing out of gland tissue."[56]  The prostate is a male sex gland, "situated around the outlet of the bladder;" the gland "produce[s] a fluid which helps provide a medium in which the male sperm cells (spermatozoa) are transported to their destinations."[57]  A pathology report, also dated March 24, 2000, indicates that Gonzalez was admitted with cancer of the prostate.[58]  The records show that Dr. Rufino Salinas performed two procedures: (1) a

---

[53]*Id*. at p. 16.

[54]*Id*.

[55]*Id*. at p. 178.

[56]J.E. Schmidt, M.D., Attorney Dictionary of Medicine A-143 (Matthew Bender 2005).

[57]*Id*. at P-475-76.

[58]SSA record, p. 201.

staging[59] pelvic lymphadenectomy[60] and (2) a radical retropubic[61] prostatectomy.[62]  A

prostatectomy is the "surgical removal of the prostate gland or a part thereof."[63]  A

lymphadenectomy "in the vicinity of a cancerous growth is important in preventing the spread of

[a] malignancy."[64]

     In addition to the records from Baptist Health System, medical records from Dr. Victorio

Rodriguez provide some evidence of the effect of Gonzalez's prostatectomy.  Those records

indicate that Dr. Rodriguez began treating Gonzalez on June 29, 2000 because of a small lump

on the right axilla.[65]  On March 5, 2002, Dr. Rodriguez examined Gonzalez, noted his March

2000 prostatectomy, and observed that Gonzalez had no evidence of disease recurrence.[66]  He

wrote that Gonzalez was "relatively asymptomatic except for hot flashes and tiredness that he

_____

[59]Staging is the "determination of the phase or stage of an illness, process, etc."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MEDICINE S-273 (Matthew Bender 2005).

[60]A lymphadenectomy is the "surgical removal of a lymph node."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MEDICINE L-217 (Matthew Bender 2005).

[61]Retropubic means "[b]ehind (in the back of) the pubic bones (in front of pelvis) or the symphysis pubis. . . ."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MEDICINE R-134 (Matthew Bender 2005).

[62]SSA record, p.201.

[63]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MEDICINE P-476 (Matthew Bender 2005).

[64]Id. at L-217.

[65]SSA record, p. 193.  The axilla is the "hollow between the side of the chest and the upper part of the arm, i.e., the armpit, formed by the junction of the arm with the side of the trunk, at the shoulder."  J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MEDICINE A-636 (Matthew Bender 2005).

[66]SSA record, p. 190.

feels mainly at the end of the day."[67]  Dr. Rodriguez's notes from an examination on July 6, 2000 indicate that Gonzalez was doing well clinically and that Gonzalez felt well.[68]  Dr. Rodriguez commented, however, that Gonzalez's prognosis was very poor, apparently because of Gonzalez's age.[69]  The doctor's notes from a physical examination conducted on September 17, 2002 reflect that Gonzalez experienced no distress and that Gonzalez was working regularly.[70]  Dr. Rodriguez's final examination was on September 18, 2002.[71]  Dr. Rodriguez's records indicate that Gonzalez cancelled his followup exam on April 7, 2003.[72]  Gonzalez's medical records subsequent to Dr. Rodriguez's treatment record Gonzalez's history of prostate cancer,[73] but little more.[74]

Finally, Gonzalez testified during his hearing that he returned to work after his prostatectomy and worked for three years—until March 27, 2003—when he was scheduled for hernia surgery.  He explained that he gets a Lupron shot every four months as part of his prostate

---

[67]*Id.*

[68]*Id.* at p. 192.

[69]*Id.* ("History of prostate carcinoma, poorly differentiated in a relatively young man, [sic] Consequently, very poor prognosis.  Clinically doing well.")

[70]*Id.* at p. 189.

[71]*Id.* at p. 188.

[72]*Id.*

[73]*Id.* at pp. 104-07 (records from Christus Santa Rosa Health Care), 123 (office visit notes from Dr. Antonio Lopez), 138 (records from San Antonio Gastroenterology Associates) & 155 (records from Concerta Medical Center).

[74]*Id.* at p. 104 (observing during an examination at Christus Santa Rosa Health Care that Gonzalez had prostatic cancer and that the prostate was normal).

cancer treatment.  Lupron—or leuprolideucetate acetate—is "a synthetic nonapeptide analog of naturally occurring gonadotropin releasing hormone."[75]  Although Gonzalez refers to Lupron as chemotherapy, Lupron is actually hormone therapy.[76]  Lupron is used to relieve—rather than treat—the symptoms of prostate cancer.[77]  Gonzalez testified that he experiences hot flashes from taking the Lupron.[78]  Dr. Hicks confirmed that hot flashes are a side effect of taking Lupron.[79]  Dr. Hicks stated that Gonzalez's medical records contained no evidence that his prostate cancer had recurred[80] and that he did not know why hot flashes would keep a person from working.[81]

In addition to hot flashes, a change in male bone density is sometimes a side effect of taking Lupron.[82]  The record contains reports of three bone scans.  A report of a bone scan conducted on July 1, 2000 was normal with no acute changes in bone density observed.[83]  A bone scan conducted on March 11, 2002 found no changes in bone density since July 1, 2000.[84]  The

---

[75]PHYSICIAN'S DESK REFERENCE 3256 (Thompson PDR 60th ed.).

[76]*See id.  See also* SSA record, p. 286 (Dr. Hicks explaining that Lupron is hormone therapy, not chemotherapy).

[77]AM. SOC'Y OF HEALTH–SYS. PHARMACISTS, AHFS DRUG INFO. 1065 (2002).

[78]SSA record, pp. 300-02.

[79]*Id*. at p. 301.  *See also* AM. SOC'Y OF HEALTH–SYS. PHARMACISTS, AHFS DRUG INFO. 1070 (2002) (stating that hot flushes are a side effect of taking Lupron).

[80]SSA record, p. 282.

[81]*Id*. at p. 289.

[82]*See* PHYSICIAN'S DESK REFERENCE 3262 (Thompson PDR 60th ed.) (stating that changes in male bone density is sometimes a side effect of taking Lupron).

[83]SSA record, p. 196.

[84]*Id*. at p. 197.

results of a third bone scan on May 13, 2004 reads as follows:

> There is a focal abnormal increased uptake noted in the left maxilla that is probably related to dental disease.  Mildly increased uptake is noted in the anterior cervical spine consistent with degenerative change.  Also abnormal increased intake of mild intensity is noted in the sternoclavicular joints and sternomanubrium.  There is no significant abnormal uptake noted elesewhere to suggest osseous metastatic disease.[85]

During the hearing, Dr. Hicks testified that Gonzalez's bone scans were normal.[86]

This evidence supports the ALJ's step-four determination because no evidence indicates that Gonzalez is unable to perform light work or to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours of an 8-hour day with normal breaks; and sit 6 hours of an 8-hour day with normal breaks.  Instead, the record indicates that Gonzalez's prostate cancer did not prevent him from working, as evidenced by the three years of work he performed after his prostatectomy.  The absence of contrary evidence is so remarkable that it appears the ALJ was generous in his determinations.

Status post hernia repair.  There is little medical evidence about Gonzalez's hernia repair; however, records from Baptist Health System indicate that Dr. Rufino Salinas repaired Gonzalez's right inguinal hernia on May 27, 2003.[87]  Dr. Salinas's summary of the procedure reflects that Gonzalez tolerated the procedure well.[88]  Medical records of subsequent treatment

---

[85]*Id*. at p. 126.

[86]*Id*. at p. 282.

[87]*Id*. at p. 229.

[88]*Id*.

only record the history of the procedure.[89]  Although the ALJ characterized Gonzalez's status

post hernia repair as a severe impairment, Dr. Hicks opined that the impairment was not severe.[90]

In addition, Dr. Hicks testified that Gonzalez was able to perform light to medium work.  He

explained that lifting 50 pounds up to one third of the day would be difficult, but that Gonzalez

could lift between 20 to 35 pounds occasionally, 20 pounds more frequently, and 10 to 15 pounds

frequently.[91]

        As for other evidence, Gonzalez testified that he continued to work until he had his hernia

repair.[92]  He explained that he remained on leave without pay from his job until he had problems

with his gallbladder.[93]  He testified that he had gallbladder surgery and then resigned from his job

in October 2003.[94]  He stated that he had missed a lot of work and did not want to be fired.[95]  He

also testified that he was not having any problems with the hernia at the time of the hearing.[96]

        This evidence supports the ALJ's step-four determination because no evidence indicates

that Gonzalez is unable to perform light work or to lift/carry 20 pounds occasionally and 10

pounds frequently; stand/walk 6 hours of an 8-hour day with normal breaks; and sit 6 hours of an

_____

[89]*Id*. at p. 138 (records from San Antonio Gastroenterology Associates); 104 (records from Christus Santa Rosa Health Care).

[90]*Id*. at p. 285.

[91]*Id*. at p. 285.

[92]*Id*. at p. 274.

[93]*Id*.

[94]*Id*. at p. 274-76.

[95]*Id*. at p. 272.

[96]*Id*. at p. 303.

8-hour day with normal breaks.  Instead, the record indicates that Gonzalez's hernia repair left him without a severe impairment and that he resigned from his job to avoid being terminated. Similar to the evidence about the prostatectomy, the absence of contrary evidence is remarkable.

Chronic obstructive pulmonary disease.  Not only does little evidence exist about status post hernia repair, little medical evidence exists about Gonzalez's chronic obstructive pulmonary disease or COPD.  COPD is "[a]ny one of a group of diseases comprising emphysema, bronchial asthma, chronic bronchitis, bronchiectasis, and cystic fibrosis."[97]  It is characterized by "chronic obstruction of the bronchial tubes."[98]  The first evidence about COPD is a radiologist's report from Southwest General Hospital.  The report is dated January 21, 2002 and reads, "[l]ung fields are hyperinflated consistent with COPD."[99]  The report reflects a diagnosis of tobacco abuse.[100] The records also show that Gonzalez was seen for bronchitis on March 17, 2003[101] and again on March 27, 2003.[102]

Gonzalez's records from Christus Santa Rosa Health Care reflect that Gonzalez was admitted on July 17, 2003, complaining about nausea, vomiting, diarrhea, dehydration and abdominal pain.[103]  Dr. Lopez examined Gonzalez and indicated that Gonzalez's lung bases

---

[97]J.E. SCHMIDT, M.D., ATTORNEY DICTIONARY OF MED. C-266 (Matthew Bender 2005).

[98]*Id.*

[99]SSA record, p. 208.

[100]*Id.*

[101]*Id.* at pp. 88-89, 207 & 212.

[102]*Id.* at pp. 90-91 & 206.

[103]*Id.* at pp. 94-99.

"show [COPD] without confluent abnormality or pleural fluid collection."[104]  Dr. Lopez observed

that Gonzalez smoked a pack of cigarettes per day.[105]  Gonzalez was discharged on July 21, 2003

after Gonzalez underwent three procedures for problems with his gallbladder and appendix.[106]

Upon discharge, he was provided with a nicotine patch.[107]  Gonzalez continued to see Dr. Lopez

on an out-patient basis.  Dr. Lopez's treatment notes for the following dates reflect a diagnosis of

COPD: June 17, 2004;[108] July 16, 2004;[109] August 11, 2004;[110] September 13, 2004;[111] March 3,

2005;[112] and March 17, 2005.[113]  These notes provide no detail about the effect COPD has on

Gonzalez's ability to work.  During the hearing, Dr. Hicks observed that there really isn't much

in the way of history of pulmonary symptoms.[114]  He stated that there were no pulmonary

function studies, but that there were some oxygen saturation office visits when Gonzalez was

---

[104]*Id.* at p. 95.

[105]*Id.* at p. 101.

[106]*Id.* at pp.108-09.

[107]*Id.* at p. 105.

[108]*Id.* at p. 130.

[109]*Id.* at p. 131.

[110]*Id.* at p. 132.

[111]*Id.* at p. 133.

[112]*Id.* at p. 134.

[113]*Id.* at p. 135.

[114]*Id.* at p. 284.

seeing Dr. Lopez, and those were consistently normal between 93 and 97 percent.[115]

This evidence supports the ALJ's step-four determination because no evidence indicates that Gonzalez is unable to perform light work or to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours of an 8-hour day with normal breaks; and sit 6 hours of an 8-hour day with normal breaks.  No evidence indicates that COPD interferes with Gonzalez's ability to work.

History of back pain.  Gonzalez's medical records from Concerta Medical Centers reflect that Gonzalez hurt his back on March 6, 2000.[116]  The records indicate that Gonzalez reported that he strained his back while moving a concrete saw.  The diagnosis for that injury was lumbar strain.[117]  The initial treatment plan for the injury was: moderate work, daily physical therapy, and Ibuprofen and Flexeril.[118]  By March 10, 2000, Gonzalez reported feeling much better, but he still had some back pain.[119]  The doctor's notes reflect that Gonzalez told him that he was 80% better, but that he still had some soreness and that he asked to increase his activities.[120]  The examining physician wrote that Gonzalez's injury was improving and that he would allow more activity, but that Gonzalez should avoid heavy lifting.[121]  He recommended moderate work, continuation of

---

[115]*Id.*

[116]*Id.* at p.155.

[117]*Id.*

[118]*Id.*

[119]*Id.* at p. 157.

[120]*Id.* at p. 158.

[121]*Id.* at p. 157.

previously prescribed medication, and physical therapy twice a week.[122]  The doctor examined

Gonzalez again on March 17, 2000 and wrote that Gonzalez was doing well, but that Gonzalez

reported problems with the weather.[123]  The doctor wrote that those problems were probably

related to degenerative disease.[124]  Gonzalez's treatment plan at that point follows: continue mild

restrictions, Vioxx for pain, and a follow-up appointment after Gonzalez's prostate surgery.[125]

Gonzalez returned to Concerta Medical Center after his surgery on April 14, 2000 and reported

that his back was worse.[126]  The doctor wrote that this result was probably due to positions

required for surgery and inactivity in bed.[127]  The doctor instructed Gonzalez to continue the

Vioxx, prescribed Valium, and discontinued the physical therapy.[128]  On April 19, 2000,

Gonzalez reported no significant improvement in his back; he reported that the pain comes and

goes.[129]  The doctor wrote that the probable reason for the aggravation of the back pain was

Gonzalez's prostate surgery and the pain in the surgical incision area.[130]  At that point, the doctor

prescribed Darvocet for pain, instructed Gonzalez to continue the Vioxx and Valium, and noted

---

[122]*Id.*

[123]*Id.* at p. 159.

[124]*Id.*

[125]*Id.*

[126]*Id.* at p. 161.

[127]*Id.*

[128]*Id.*

[129]*Id.* at p. 162.

[130]*Id.*

that Gonzalez was "off work."[131]  On April 26, 2000, Gonzalez reported a slight improvement.[132]

At that time, Gonzalez reported that he was not working per his surgeon's instructions.[133]  The

doctor instructed Gonzalez to continue the Vioxx and Valuim and recommended that he see his

surgeon before he resumed physical therapy.[134]  On May 3, 2000, Gonzalez reported that

although his back was better, it was still sore.  He reported that his back was much worse the day

before when the weather had been cold.[135]  Gonzalez reported that he was not working per

instructions from his surgeon.[136]  The examining physician instructed Gonzalez to continue

taking Vioxx and noted that "arthritis in back would continue to need NSAIDs [(nonsteroidal

anti-inflammatory drugs)]."[137]  On May 12, 2000, Gonzalez reported that his back was better and

the pain increased with changes in weather.[138]  The doctor instructed Gonzalez to continue the

Vioxx and wrote that he would continue conservative treatment.[139]  On May 31, 2000, Gonzalez

reported feeling better and feeling no back pain.[140]  The doctor released Gonzalez for regular

---

[131]*Id.*

[132]*Id.* at p. 163.

[133]*Id.*

[134]*Id.*

[135]*Id.* at p. 160.

[136]*Id.*

[137]*Id.*

[138]*Id.* at p. 164.

[139]*Id.*

[140]*Id.* at p. 165.

work and instructed Gonzalez to continue the Vioxx.[141]  The doctor released Gonzalez from further followup on June 30, 2000, with a prescription for Vioxx for pain.[142]

The next evidence of back pain is a complaint on March 2, 2004 to Dr. Lopez.[143]  Dr. Lopez prescribed a muscle relaxant and Motrin.[144]  There is no mention of back pain in the notes for Gonzalez's subsequent visits with Dr. Lopez.[145]  The next evidence is a complaint on March 23, 2005 to Dr. Salinas about lower back pain.[146]  Dr. Salinas's notes do not reflect any treatment for back pain.

The final evidence about back pain is Gonzalez's testimony at the hearing.  Gonzalez testified that the doctor told him "that he had hurt [his back] so many times that it had turned into arthritis."[147]  He implied that his back hurt when the weather changed, causing him difficulty with sleeping.[148]  He stated that he sometimes used sleeping pills.  About his last job, he testified that he had to climb up on top of machines and refuel them using large hoses.  He stated that he got to

---

[141]*Id*.

[142]*Id*. at p. 166.

[143]*Id*. at p. 124.

[144]*Id*.

[145]*Id*. at pp. 125 (office visit on May 6, 2004), 129 (office visit on May 20, 2004), 130 (office visit on June 17, 2004), 131 (office visit on July 17, 2004), 132 (office visit on August 11, 2004), 133 (office visit on September 13, 2004), 134 (office visit on March 3, 2005), & 135 (office visit on March 17, 2005).

[146]*Id*. at p. 147.

[147]*Id*. at p. 304.

[148]*Id*.

where he could no longer handle the hoses.[149]  He testified that he no longer had the strength to climb onto the machines to perform his former job.  He also testified that he had to move 40-pound barricades and 12 to 15-pound sandbags from time to time in his former job.[150]

This evidence supports the ALJ's step-four determination because no evidence indicates that Gonzalez is unable to perform light work or to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours of an 8-hour day with normal breaks; and sit 6 hours of an 8-hour day with normal breaks.  It supports the ALJ's determinations because it indicates that Gonzalez could have difficulty performing his past relevant work, but it does not indicate that Gonzalez cannot perform lighter work, requiring minimum lifting.  Even when Gonzalez was undergoing treatment for lumbar strain, his treating physician permitted Gonzalez to perform moderate work.  Only Gonzalez's prostate surgeon restricted him from working after Gonzalez's prostatectomy.  Gonzalez complained during the hearing about arthritis, but his medical records contain only one brief entry about arthritis.

History of anxiety/depression.  The first evidence about anxiety is an entry in Dr. Lopez's medical notes for September 15, 2003.[151]  Although the notes for that day are difficult to decipher, the notes include the words "anxiety attacks" and indicate that Dr. Lopez prescribed Valium.[152]  Valium is used for the short-term relief of anxiety.[153]  Notes for a visit on October 20,

---

[149]*Id*. at p. 276.

[150]*Id*. at p. 307.

[151]*Id*. at p. 246

[152]*Id*. at p. 246.

[153]*See* PHYSICIAN'S DESK REFERENCE 2822 (Thompson PDR 60th ed.).

2003 contain an entry about anxiety, but do not indicate that Dr. Lopez prescribed any treatment for anxiety at that time.[154]  Most of the notes for the next visit—on February 17, 2004—are illegible, but it appears Dr. Lopez prescribed Paxil[155]—a psychotropic drug used to treat depression and anxiety.[156]  Dr. Lopez made another note about anxiety and depression on March 2, 2004.[157]  Although the notes for that day are almost illegible, there does not appear to be any treatment prescribed for anxiety or depression.[158]  Notes for visits on May 6, 2004,[159] May 20, 2004,[160] and June 17, 2004 contain the same type of entry, except that Dr. Lopez prescribed Valium on June 17, 2004.[161]  The notes for a visit on July 16, 2004 state that the visit was for a followup for depression and anxiety; however, the notes do not indicate any treatment.[162]  Notes for a visit on August 11, 2004 reflect a note about depression and a prescription for Prozac—a psychotropic drug used to treat depression[163]—but no note about anxiety.[164]  Notes for subsequent

---

[154]SSA record, p. 244.

[155]*Id*. at p. 123.

[156]*See* PHYSICIAN'S DESK REFERENCE 1501-02 (Thompson PDR 60th ed.).

[157]SSA record, p. 124.

[158]*Id*.

[159]*Id*. at p. 125.

[160]*Id*. at p. 129.

[161]*Id*. at p. 130.

[162]*Id*. at p. 131.

[163]*See* PHYSICIAN'S DESK REFERENCE 1771-72 (Thompson PDR 60th ed.).

[164]SSA record, p. 132.

visits have no annotations about anxiety.[165]   The next evidence is found in records from Dr.
Salinas.  Those records show that Gonzalez complained about anxiety attacks on March 23,
2005.[166]  The notes for that visit do not reflect treatment.

The final evidence is Gonzalez's testimony.  Gonzalez testified that he started having
anxiety attacks when he started having the Lupron shots and taking Casodex.[167]   Casodex is a
drug used in conjunction with a gonadotropin releasing hormone—here, Lupron—to relieve the
symptoms of prostate cancer.[168]  He stated that Dr. Lopez had prescribed Valium for anxiety, but
that the doctor had not referred him to a psychiatrist or psychologist.  He stated that he
sometimes has anxiety attacks when he is driving.  He explained that it made him feel like
stopping the truck, getting out, and running and screaming.[169]  He described the anxiety attacks as
unpredictable and intermittent.[170]  He said it was difficult to concentrate when he had an anxiety
attack.[171]  Although he explained that he takes medication for his anxiety, he also stated that he
relied more on prayer than the medication.[172]  About depression, Gonzalez testified as follows:

> I don't like seeing my wife having to do the yard, because I can't do it.  I don't
> like to see her do repairs that I use [sic] to do, because I can't do it. . . . I don't like

---

[165]*See id*. at pp. 133 (Sept. 13, 2004), 134 (Mar. 3, 2005) & 135 (Mar. 17, 2005).

[166]*Id*. at p. 147.

[167]*Id*. at p. 277.

[168]*See* Am. Soc'y of Health–Sys. Pharmacists, AHFS Drug Info. 906 (2002).

[169]SSA record, p. 296.

[170]*Id*. at p. 297.

[171]*Id*.

[172]*Id*. at p. 298.

depending on my wife's check to make payments.  I have a good wife, a very
good wife.  I don't believe she should have to go through all of this.  And when
you can't work you're not a man.  You're half a man.  If I could work I wouldn't
be here.  I'd rather work that be here, I don't want to be here.[173]

Finally, Dr. Don Marth—the vocational expert who testified at Gonzalez's hearing—testified that

a person who is affected by hot flashes and anxiety attacks to a marked degree would be unable

to operate a road roller, street sweeper, utility tractor, or escort vehicle.[174]

       In evaluating this evidence, the ALJ referred to the criteria for affective disorders and

anxiety related disorders[175] and concluded that Gonzalez's anxiety and depression resulted in

mild restriction of activities of daily living; mild difficulties in maintaining social functioning;

mild to moderate difficulties in maintaining concentration, persistence or pace; and no episodes

of decompensation of extended duration.[176]  The evidence supports the determination for the

following reasons:  No evidence exists that Gonzalez's impairments are so severe as to require

treatment by a psychiatrist, psychologist or counselor.  Gonzalez treats his impairments with

Valium.  No evidence suggests that the impairments affect Gonzalez to a degree more severe

than that determined by the ALJ.  Although Gonzalez disagrees with the ALJ's assessment of his

alleged impairments resulting from anxiety and depression, the foregoing discussion of the

evidence supports the ALJ's determinations for the reasons given.

       Gonzalez complains that the ALJ did not consider evidence about fatigue.  Although

---

[173]*Id*. at p. 303.

[174]*Id*. at p. 308.

[175]20 C.F.R., pt. 404, subpt. P, appx. 1, §§ 12.04 & 12.06.

[176]SSA record, p.15.

Gonzalez characterizes the record as replete with references to fatigue, the record contains little evidence about fatigue.  The first reference is a medical note in records from Southwest General Hospital.[177]  On January 18, 2002, Gonzalez stated that he felt tired and that he thought it was because of the medication he was taking.[178]  A note by Dr. Rodriguez  indicates that Gonzalez complained about feeling tired on September 3, 2002.[179]  A note by Dr. Lopez indicates that Gonzalez complained about tiring easily on May 6, 2004.[180]  An entry on July 16, 2004, indicates that Gonzalez tired more easily than before.[181]

The other evidence is Gonzalez's testimony.  Most of that testimony, however, is about how fatigue affects Gonzalez's ability to perform his former job, not to the light work the ALJ determined Gonzalez could perform.  In testifying about why he retired from his job, Gonzalez explained that he was worn out and that he couldn't climb on top of the machines any longer to refuel them.[182]  About his former job, he explained that he would be able to climb on top of a fuel truck maybe two or three times a day.[183]  He explained that he didn't have any strength left.[184] About how his treatment for prostate cancer made him feel, he testified that he couldn't raise his

---

[177]*Id*. at p. 220.

[178]*Id*.

[179]*Id*. at p. 189.

[180]*Id*. at p. 125.

[181]*Id*. at p. 131.

[182]*Id*. at p. 276.

[183]*Id*. at p. 299.

[184]*Id*. at p. 299.

arms up too long and that he couldn't sit down for too long because he is "just worn out, . . . just tired, exhausted."[185]  He stated that his fatigue left him worn out.[186]  He said that sometimes it was even hard for him to pick up a cup of coffee to drink it.  He said he wasn't like that all the time, but that his body was just worn out.[187]  Gonzalez also provided a letter by his former supervisor which concluded that Gonzalez had retired from his job because because he did not have the stamina required to perform his job duties.[188]  This letter, however, goes to Gonzalez's ability to perform his past work, not the light work the ALJ determined Gonzalez could perform.  Although Gonzalez complains that the ALJ disregarded the letter, the ALJ's determinations reflect the consideration of the letter because the ALJ determined that Gonzalez could no longer perform his former job.

Gonzalez also complains that the ALJ did not consider his complaints about fatigue, but the ALJ's determinations reflect that the ALJ considered those complaints because the ALJ determined that Gonzalez can no longer perform his previous work.  The ALJ's determinations also reflect the consideration of complaints about fatigue because they determine that Gonzalez can perform light work which permits normal breaks and does not require heavy lifting.  Moreover, Gonzalez bore the burden of demonstrating that he had no residual functional capacity.  The evidence he provided does not show that he has no residual functional capacity.  Instead, substantial evidence supports the ALJ's step-four determination that Gonzalez has the

---

[185]*Id*. at p. 277.

[186]*Id*. at p. 300.

[187]*Id*. at p. 300.

[188]*Id*. at p. 116.

residual functional capacity to do light work.

Gonzalez's final complaint about the ALJ's step-four analysis is about the ALJ's consideration of a statement made in a document signed by Dr. Lopez—a Physician's Statement for Disability Homestead Exemption.[189]  The language on the document indicates that it is used by Bexar County property owners to obtain an exemption from paying property taxes.  Notably, the form includes the following definitions:

Disability for the purpose of this exemption means that:

(a) a person is <u>unable to engage in any substantial gainful activity</u> by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period not less than 12 months; or
****
(c) *a person must have a disability that would qualify as a disability under the Social Security Act*."

These definitions correspond to the Act's definitions of disabled, indicating that the Bexar County tax appraisal district intends to exempt persons who are disabled under the Act from paying property taxes.  Gonzalez, however, offers it for the purpose of proving that he is disabled under the Act.

The form requires a physician to answer four questions, two of which are relevant to Gonzalez's complaint that the ALJ disregarded Dr. Lopez's opinion.  In answer to the question, "[w]hen do you expect that the applicant to able to return to work?" Dr. Lopez answered, "Never."  In response to a statement reading, "[p]lease state in layman's terms the condition from which the applicant is being or has been treated," Dr. Lopez responded, "severe chronic pulmonary disease, anxiety, depression."  The ALJ did not give these responses controlling

---

[189]*Id*. at p. 120.

weight because the ALJ determined that the responses were "not supported by the clinical findings and [that they were] inconsistent with other substantial evidence."[190]   The ALJ then reviewed the contrary evidence and stated the "[n]o other physician has opined that [Gonzalez] is disabled or Gonzalez has severe COPD."[191]   The ALJ was wrong about the latter statement because Dr. Salinas completed a similar form indicating that Gonzalez was unable to return to work indefinitely because he was being treated for prostate cancer and because he had a hernia repair in May 2003.[192]   But this determination, like Dr. Lopez's determination is contradicted by the evidence.

Even though the ALJ must ordinarily give a treating physician's opinion considerable weight in determining whether a person is disabled, the ALJ may reject the opinion of a physician when the evidence supports a contrary conclusion.[193]   The ALJ may assign little or no weight to a treating physician's opinion when the opinion is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.[194]   The suggestion that Gonzalez is disabled under the Act and that he is unable to return to work as indicated by Dr. Lopez and Dr. Salinas on the property tax exemption forms are conclusory and are not even supported by their own treatment notes.  The foregoing discussion of the evidence shows that the evidence does not support Dr. Salinas's statement that

---

[190]*Id*. at p. 15.

[191]*Id*.

[192]*Id*. at 121.

[193]*See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

[194]*See Newton*, 209 F.3d at 456.

problems with prostate cancer or with a hernia repair prevent Gonzalez from working.  Likewise,

no evidence supports Dr. Lopez's statement that COPD, anxiety or depression prevents Gonzalez

from ever working again.  Where the ALJ relied on a contrary medical opinion—by Dr.

Hicks—that is supported by substantial evidence, the ALJ does not err by not giving controlling

weight to a physician's statement.

### 2. Whether substantial evidence supports the ALJ's step-five determination

In step five, the ALJ determined that Gonzalez was unable to perform the full range of light work

because of his nonexertional limitations.  After considering the opinion of a vocational

expert—Mr. Marth—the ALJ determined that Gonzalez has the transferrable skills of equipment

operator skills and that he retains the capacity for work that exists in significant numbers in the

national economy.  Gonzalez complains that the vocational expert did not identify the particular

transferrable skills.

> About the transferability of skills, the SSA regulations provide as follows:
>
> When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision.  Findings should be supported with appropriate documentation.
>
> When a finding is made that a claimant has transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the State agency's determination or ALJ's decision.[195]

Here, the ALJ determined that Gonzalez had the transferrable skills of equipment operator skills,

but Dr. Marth did not specifically identify equipment operator skills as transferrable skills.

Instead, Dr. Marth implied these skills were transferrable as evidenced by the following

---

[195]SSR 82-41: Titles II & XVI: Work Skills & Their Transferability as Intended by the Expanded Vocational Factors Regulations, effective Feb. 6, 1979.

testimony:

> [H]is operating engineer, equipment operating job would transfer to like road
> roller which is light, semiskilled, SVP of three.  Street sweeper operator, light, and
> SVP of three.  Utility truck operator is light with and [sic] SVP of four.  These
> would directly transfer from his operating engineer or heavy equipment operator. .
> . . He said he did flat rollers, front end loaders, maintainers, and that kind of thing,
> which require more strength than these jobs, but they're within the same
> Dictionary of Occupational parameters, which is operating engineer work and
> equipment operator.[196]

This excerpt shows that Dr. Marth did not  specifically testify that "Gonzalez possesses

equipment operator skills and those skills are transferrable to light work," but Dr. Marth's

testimony nevertheless constitutes substantial evidence supporting the ALJ step-five

determination because Dr. Marth used language that could mean nothing else.  Dr. Marth

identified the skills Gonzalez acquired in his former job—equipment operator—and identified

specific light-work jobs to which the acquired work skills would transfer.

## VI.  Recommendation

Substantial evidence supports the ALJ's step-four and step-five determinations; therefore,

I recommend that Gonzalez's request for relief (docket entry # 3) be **DENIED** and that the

decision of the Commissioner be **AFFIRMED**.

## VII. Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this Memorandum and

Recommendation on all parties by either (1) electronic transmittal to all parties represented by

attorneys registered as a "Filing User" with the Clerk of Court, or (2) by mailing a copy to those

not registered by certified mail, return receipt requested.  Written objections to this Memorandum

---

[196]SSA record, p. 294.

and Recommendation must be filed within 10 days after being served with a copy of same, unless this time period is modified by the District Court.[197]  **Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge.**  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court.[198]  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.[199]

      **SIGNED** on February 14, 2007.

NANCY STEIN NOWAK
UNITED STATES MAGISTRATE JUDGE

---

[197]28 U.S.C. §636(b)(1); FED. R. CIV. P. 72(b).

[198]*Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir. 2000).

[199]*Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

32